UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>v.<br><br>BRIAN KELSEY and<br>JOSHUA SMITH,<br><br>    Defendants. | No. 3:21-cr-00264 |

**DEFENDANT KELSEY'S MOTION TO WITHDRAW PLEA AND FILE MOTION TO DISMISS**

# TABLE OF CONTENTS

Introduction..................................................................................................3

Argument......................................................................................................5

    I.    It would be unfair and unjust to allow Defendant to be sentenced to a crime which is legally impossible for him to commit..........................7

        a.    The government's theory in Count Five has been foreclosed by the Federal Election Commission.................................................8

        b.    Count One fails because there can be no conspiracy if there is no underlying crime........................................................................11

    II.    Before entering into this plea agreement, Kelsey consistently maintained his innocence........................................................................12

    III.    Kelsey entered into this plea agreement hastily and with an unsure heart due in large part to the stress of simultaneously dealing with a terminally ill father, newborn twins, and a three-year-old daughter...14

    IV.    Kelsey moved to withdraw his plea as early as practicable after his father's death..................................................................................15

    V.    Kelsey's inexperience with the criminal justice system contributed to the plea agreement..............................................................................16

    VI.    There is no potential prejudice to the government if the motion to withdraw is granted.............................................................................18

Conclusion...................................................................................................18

Certification of Counsel..................................................................................20

Certificate of Service.....................................................................................21

## INTRODUCTION

Defendant Brian Kelsey seeks the Court's approval to withdraw his guilty plea because he pleaded guilty to something that is not a crime and for other factors justifying withdrawal of the plea. With the Court's permission, he would also file the attached Proposed Motion to Dismiss asking the Court to dismiss all five counts in the indictment. *See* Exhibit 1. Though not the norm, it is permissible to withdraw a guilty plea and file a Motion to Dismiss. *See, generally, United States v. Mendez-Santana*, 645 F.3d 822, 829 (6th Cir. 2011).

Federal Rule of Criminal Procedure 11(d) provides a "defendant may withdraw a plea of guilty . . . after the court accepts the plea, but before it imposes sentence if . . . the defendant can show a fair and just reason for requesting the withdrawal." The "fair and just" standard is "applied liberally," and a motion to withdraw filed prior to sentencing is to be "liberally construed." *United States v. Davis*, 428 F.3d 802, 805 (9th Cir. 2005); *United States v. Buckles*, 843 F.2d 469, 471 (11th Cir. 1988). It would be unfair and unjust to allow Defendant to be sentenced to a crime which is legally impossible for him to commit, and that is what occurred in this case, as explained below. Therefore, Defendant humbly requests that this Court allow him to withdraw his guilty plea and grant him the opportunity to explain why this case should be dismissed as a matter of law.

"Campaign finance regulation has been termed 'baffling and conflicted.'" *North Carolina Right to Life, Inc. v. Leake*, 525 F.3d 274, 296 (4th Cir. 2008) (quoting *Majors v. Abell*, 361 F.3d 349, 355 (7th Cir. 2004)). "It is an area in which speakers are now increasingly forced to navigate a maze of rules, sub-rules, and cross-references in

order to do nothing more than project a basic political message. Only those able to hire the best team of lawyers may one day be able to secure the advisory opinions or otherwise figure out the myriad relevant rulings with any degree of assurance that they will escape civil and criminal sanctions[.]" *Id.* (internal citation omitted). In this case, Defendant Brian Kelsey in fact hired an expert team of lawyers before taking the actions at issue in the case. He believed he followed the law and, prior to accepting the plea at issue, he consistently and repeatedly maintained his innocence. Yet, he was criminally indicted for those actions five years later.

Kelsey entered the plea at issue with an unsure heart and confused mind, coming shortly after his twin sons were born and while his father was effectively on his death bed in home hospice care. Such a mental state is exactly what Rule 11(d) was designed for. *See United States v. Walden*, 625 F.3d 961, 965 (6th Cir. 2010). During this incredibly stressful and confusing time, Kelsey was given a mere 48 hours to make a life altering decision – a decision made without fully understanding ancillary consequences that have come to light only after he entered his plea. Furthermore, he moved to withdraw the plea as early as practicable after his father's death.

In light of these unique facts, Kelsey humbly requests that he be permitted to withdraw his guilty plea and have his proposed Motion to Dismiss heard.

## ARGUMENT

The Court should grant the Motion to Withdraw Plea under Rule 11(d) because Kelsey pleaded guilty to a set of facts that do not actually constitute a crime and

4
Case 3:21-cr-00264 Document 93 Filed 03/17/23 Page 4 of 20 PageID #: 288

entered into his plea agreement with unsure heart and confused mind.

The Sixth Circuit has advised that a district court should consider seven factors when considering a motion to withdraw a guilty plea: "(1) the amount of time that elapsed between the plea and the motion to withdraw it; (2) the presence (or absence) of a valid reason for the failure to move for withdrawal earlier in the proceedings; (3) whether the defendant has asserted or maintained his innocence; (4) the circumstances underlying the entry of the guilty plea; (5) the defendant's nature and background; (6) the degree to which the defendant has had prior experience with the criminal justice system; and (7) potential prejudice to the government if the motion to withdraw is granted. *United States v. Martin*, 668 F.3d 787, 794 (6th Cir. 2012). "The factors are a general, non-exclusive list and no one factor is controlling." *United States v. Bazzi*, 94 F.3d 1025, 1027 (6th Cir. 1996) (per curiam). "The relevance of each factor will vary according to the circumstances surrounding the original entrance of the plea as well as the motion to withdraw." *United States v. Haygood*, 549 F.3d 1049, 1052 (6th Cir. 2008)).

When it was adopted, Rule 11 abrogated the harsh ten-day time limit in which to withdraw a guilty plea found in the prior Rule II(4) of the Criminal Appeals Rules of 1933. *See* Lester B. Orfield, *Federal Criminal Appeals Rules as Interpreted in the Decisions*, 21 N.C. L. Rev. 28, 39 (1942).[1] Now, this Court faces no time restriction on granting a motion to withdraw plea; the Court has full discretion. *See* Fed. R. Crim.

---

[1] *Available at* https://scholarship.law.unc.edu/cgi/viewcontent.cgi?article=1589&context=nclr.

P. 32 Advisory Committee Note to Subdivision (d) (later moved to R. 11). The District Court maintains discretion to grant plea withdrawals well beyond the three to four months at issue in this case. *See United States v. Hall*, No. 15-CR-55-LRR, 2016 U.S. Dist. LEXIS 38280, at *1 (N.D. Iowa Mar. 24, 2016) ("The four-month delay in filing the motion to withdraw did not weigh against permitting defendant to withdraw his plea."). Indeed, this Court granted a motion to withdraw made over eight months after the plea agreement was entered in *United States v. Maxwell*, No. 3:19-cr-00208, 2022 U.S. Dist. LEXIS 65527, at *7 (M.D. Tenn. Apr. 8, 2022).

I. **It would be unfair and unjust to allow Defendant to be sentenced to a crime which is legally impossible for him to commit.**

A motion that would render a defendant innocent is a fair and just reason to grant a motion to withdraw plea. It is not just a factor this Court should consider, but it is an important factor: "Whether the movant has asserted his legal innocence is an important factor to be weighed." *United States v. Lewis*, 800 F. App'x 353, 358 (6th Cir. 2020). For example, in *Maxwell*, Judge Trauger granted a motion to withdraw a guilty plea when the defendant presented to the Court a motion to suppress evidence that he claimed showed it was impossible for police officers to see the marijuana in his car through its tinted windows, thus rendering the search of his vehicle illegal and making his conviction impossible as a matter of law. 2022 U.S. Dist. LEXIS 65527, at *10-11. Moreover, she did so even though "most of the factors weigh[ed], at least to some degree, *against* granting the defendant's motion," including the eight-month delay between the plea and the motion. *Id*. at *10 (emphasis added). Regardless, the defendant's assertion of "legal innocence" meant that one "factor

weigh[ed] heavily in favor of granting the defendant's motion and that . . . factor outweigh[ed] the others." *Id.* at *7, *10.

As set forth in the proposed Motion to Dismiss attached hereto, Kelsey pleaded guilty to offenses that are not actually crimes; thus, he maintains his legal innocence, and like Maxwell, his motion to withdraw should be granted.[2]

### a. The government's theory in Count Five has been foreclosed by the Federal Election Commission.

The government's theory in Count Five that Kelsey "coordinated" communications allegedly paid for by his state committee to benefit his federal campaign has been foreclosed by the Federal Election Commission.

In FEC Advisory Opinion 2007-1 (McCaskill), the FEC concluded that a federal candidate cannot "coordinate" with his or her own state campaign committee for purposes of Federal campaign finance law. The FEC explained why:

> Under the first prong of the "coordinated communication" definition, a communication is only subject to the regulations if it "is paid for by a person other than that candidate, an authorized committee, political party committee, or agent of any of the foregoing." 11 C.F.R. 109.21(a)(1). In these circumstances, the candidate and her agents [the state campaign committee] are paying for these communications, so the payment prong is not met and the "coordinated communication" definition is not applicable.

*Id.* at 5-6.[3] In other words, the Commission held that a payment from a candidate's own state committee cannot be the source of funding for a coordinated

---

[2] This portion of this Motion addresses only Counts One and Five of the indictment because those are the only counts that Kelsey pled guilty to in his plea agreement. For the reasons set forth in the proposed Motion to Dismiss, Counts Two, Three, and Four also fail to set forth a series of facts constituting a violation of federal law.

[3] *Available at* https://www.fec.gov/files/legal/aos/2007-01/2007-01.pdf.

communication, and thus an in-kind contribution, to that same candidate's federal committee because the contribution is not "paid for, in whole or in part, by a person *other than that candidate*, authorized committee, or political party committee," or agents thereof, which is a required element of coordination.. 11 C.F.R. § 109.2.1(a)(l) (emphasis added).

This view was reiterated in FEC Advisory Opinion 2009-26 (Coulson).[4] In that opinion, the Commission concluded that a candidate's state committee mailer could not constitute a "coordinated communication" with the same candidate's federal campaign committee.

FEC advisory opinions matter both because of the agency's expertise but also because federal law "create[s] a 'safe harbor' for parties who rely on advisory opinions" issued by the FEC. *FEC v. Nat'l Rifle Ass'n*, 254 F.3d 173, 185–86 (D.C. Cir. 2001). To wit, the Federal Election Campaign Act, 52 U.S.C. § 30101 *et seq.* ("Election Act"), expressly states so:

> Any advisory opinion rendered by the Commission under subsection (a) may be relied upon by-
>
> (A) any person involved in the specific transaction or activity with respect to which such advisory opinion is rendered; and
>
> (B) any person involved in any specific transaction or activity which is indistinguishable in all its material aspects from the transaction or activity with respect to which such advisory opinion is rendered.

52 U.S.C. § 30108(c)(1). It further states, "Notwithstanding any other provisions of law, any person who relies upon any provision or finding of an advisory opinion in

---

[4] *Available at* https://saos.fec.gov/aodocs/AO%202009-26.pdf.

accordance with the provisions of paragraph (1) and who acts in good faith in accordance with the provisions and findings of such advisory opinion shall not, as a result of any such act, be subject to any sanction provided by this Act." *Id.* at § 30108(c)(2). Thus, members of the public are entitled to rely on representations made in advisory opinions.

In addition, the FEC has repeated its interpretation that federal candidates cannot coordinate with their state committees as a matter of law in the enforcement process. In *In re Steve Oelrich*, Matter Under Review 6601, (FEC Factual & Legal Analysis, July 16, 2014),[5] the FEC noted that advertisements paid for by a candidate's own state committee could not be coordinated with his federal campaign committee because a "coordinated communication" cannot exist where the state and federal committees exist for the benefit of the *same person*:

> It does not appear that the costs of the radio ad would constitute an in-kind contribution from the State Committee to the Federal Committee by virtue of being a coordinated communication. Commission regulations set forth a three-prong test to determine whether a payment for a communication is an in-kind contribution as a result of coordination between *the person making the payment and the candidate.* Consistent with Commission advisory opinions, the Commission concludes that the advertisement here would not meet the payment prong of the coordination test at 11 C.F.R. § 109.2.1(a)(l).

*Oelrich*, MUR 6601, at 9 n.10 (citations omitted) (emphasis added).

The Commission's longstanding regulations and interpretations of its regulations bind the Government. *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015) (explaining agency regulations "have the 'force and effect of law'"). The Federal

---

[5] *Available at* https://www.fec.gov/files/legal/murs/6601/14044362763.pdf.

Election Commission and the Department of Justice are sister agencies of the same Federal Government. The Department of Justice cannot criminally prosecute people for actions the Federal Election Commission has announced are legal, especially considering the "knowing and willful" intent requirement for criminal violations of the Federal Election Campaign Act. *See* 52 U.S.C. § 30109(d). The knowing and willful standard requires that "acts were committed with full knowledge of all of the relevant facts and a recognition that the action is prohibited by law." 122 Cong. Rec. H3778 (daily ed. May 3,1976); *see also AFL-CIO v. FEC*, 628 F.2d 97, 98, 101-02 (D.C. Cir. 1980) (noting that a "willful" violation includes "such reckless disregard of the consequences as to be equivalent to a knowing, conscious, and deliberate flaunting of the Act."). In other words, the defendant must know his conduct was "unauthorized and illegal." *United States v. Hopkins*, 916 F.2d 207, 213 (5th Cir. 1990) (quoting *United States v. Bordelon*, 871 F.2d 491, 494 (5th Cir. 1989)).

Because Kelsey acted in *accordance* with the FEC's Advisory opinions and interpretations of the law in its enforcement decisions, he did not violate the law as alleged in Count Five as a matter of law and certainly did not violate the law knowingly and willfully.

### b. Count One fails because there can be no conspiracy if there is no underlying crime.

Count One fails because the "conspiracy" it alleges is not unlawful. "[T]here can be no conviction for conspiracy to commit an offense against the United States if the act that the alleged conspirators agree to do has not been made unlawful." *Ventimiglia v. United States,* 242 F.2d 620, 622 (4th Cir. 1957); *see also Parr v. United*

*States*, 363 U.S. 370, 393 (1960); *accord United States v. Galardi*, 476 F.2d 1072, 1079 (9th Cir. 1973) ("It should require no citation of authority to say that a person cannot conspire to commit a crime against the United States when the facts reveal there could be no violation of the statute under which the conspiracy is charged."). Here, as explained above, the allegation in Count Five, to which Kelsey pleaded guilty, is not a crime.[6] Accordingly, any supposed agreement or agreements between Kelsey and other persons concerned only lawful activity. As the Third Circuit held in the campaign finance context, when a "conviction on [the] substantive count cannot stand, neither can conviction for conspiring to commit that offense" under 18 U.S.C. § 371. *Curran*, 20 F.3d at 562.

In short, it would be unfair and unjust to proceed with sentencing Kelsey for a crime which was legally impossible for him to commit, and Kelsey should therefore be allowed to withdraw his guilty plea in this unique circumstance.

## II. Before entering into this plea agreement, Kelsey consistently maintained his innocence.

In addition to "legal innocence," fair and just reasons for withdrawing a guilty plea include a defendant's "actual innocence." *United States v. Bland*, No. 20-3047, 2021 U.S. App. LEXIS 32297, at *2 (7th Cir. Oct. 28, 2021). And "[c]ourts look more hospitably on a motion to withdraw a guilty plea when the motion is coupled with an assertion of innocence." *United States v. Doyle*, 981 F.2d 591, 596 (1st Cir. 1992). In this case, Kelsey repeatedly asserted his innocence prior to entering his guilty plea.

---

[6] Moreover, each of the other supposedly illegal acts charged in the indictment fail as a matter of law for the reasons explained in the proposed Motion to Dismiss.

As early as May 30, 2017, prior to the beginning of any Department of Justice investigation, Kelsey issued a public statement maintaining his innocence to the *Tennessean*, which first raised the allegation based on a tip from a rival political consultant.[7] Kelsey repeated similar statements to news media reporting on grand jury proceedings against him in 2019.

After the investigation revived in spring 2021, Kelsey continued to maintain his innocence. When the Department of Justice served him with a target letter, Kelsey sat for a "reverse proffer" session to learn of the evidence against him. He then submitted to the Justice Department an 80-page memo with 21 exhibits, refuting the assertions made in the proffer session. His legal team presented a PowerPoint to the prosecutors highlighting the memo in an effort to stave off indictment. Finally, they appealed and were granted a session with the head of the Office of Public Integrity in Washington, D.C.

Nevertheless, Kelsey was indicted, and he continued to maintain his innocence through public statements, telling his state Senate colleagues, "I am totally innocent. . . . And I trust in time the truth will prevail."[8] On November 1, 2021, he initially pleaded "innocent" before this Court. Thus, Defendant asserted or maintained his

---

[7] Dave Boucher and Joel Ebert, "Expert: Money trail shows possible misconduct by state Sen. Brian Kelsey," *Tennessean* (June 1, 2017), available at https://www.tennessean.com/story/news/2017/06/02/expert-money-trail-showspossible-misconduct-state-sen-brian-kelsey/362453001/.

[8] Statement of Sen. Brian Kelsey, Senate Session, 3rd Extraordinary Session, 1st Extraordinary Day, at 21:20 – 25:25 (Oct. 27, 2021), available at https://tnga.granicus.com/player/clip/25542?view_id=611&redirect=true&h=461805 00cc6d8f491b9603f2c7f7cf06.

innocence consistently for over five years, with the last 100 days constituting an aberration in an otherwise consistent pattern. Because of these consistent assertions of innocence, this factor, too, weighs in favor of granting the motion to withdraw.

III. **Kelsey entered into this plea agreement hastily and with an unsure heart due in large part to the stress of simultaneously dealing with a terminally ill father, newborn twins, and a three-year-old daughter.**

The unique circumstances surrounding Kelsey's plea support permitting its withdrawal. Rule 11(d) is designed to allow a hastily entered plea made with unsure heart and confused mind to be undone. *Walden*, 625 F.3d at 965. As the American Bar Association has noted, "[P]lea bargaining induces defendants to plead guilty for various reasons, some of which have little or nothing to do with factual and legal guilt." *2023 Plea Bargain Task Force Report* at 20, American Bar Association, Criminal Justice Section, ("ABA Report").[9] Brian Kelsey was given less than 48 hours to make a decision on his plea agreement at a time when he was contending with his father on his death bed due to pancreatic cancer and newborn twins. Kelsey Decl. ¶¶ 5, 7, 15, attached as Exhibit 2. Under these circumstances, he was in a confused state mentally and unable to fully consider the ramifications of his plea agreement. In short, he had an unsure heart and a confused mind and should be permitted to withdraw his plea.

Kelsey's father, Robert Kelsey, was diagnosed with terminal, inoperable pancreatic cancer in March 2022. *Id.*, ¶ 1,. He underwent chemotherapy in an effort

---

[9] *Available at* https://www.americanbar.org/content/dam/aba/publications/criminaljustice/plea-bargain-tf-report.pdf.

to shrink the tumor through August 2022, but he was forced to stop when his body would take no more. *Id.*, ¶ 2. In August 2022, he was hospitalized for three weeks with little prognosis for survival. *Id.*, ¶ 3. Remarkably, he found the strength to live and was released from the hospital into home hospice care. *Id.*, ¶ 4. But for the next six months, death was an imminent possibility each day. *Id.*, ¶ 5. Therefore, Brian Kelsey called his father up to three times a day on average, in part just to ensure he was still alive. *Id.* Kelsey's plea agreement was entered November 22, 2022, right in the middle of this excruciating time.

In addition, Kelsey's twin sons were born September 10, 2022. *Id.*, ¶ 7. This greatly increased the physical and emotional burden on Kelsey, who, along with his wife, shared the duties of feeding his twin sons approximately every three hours, as well as caring for their three-year old daughter. *Id.*, ¶¶ 8-12.

In the midst of this excruciatingly stressful and emotional time, Kelsey was presented with a plea offer that expired under 48 hours after it was made. *Id.*, ¶ 15. As a result of this immense pressure, he entered the plea hastily and with unsure heart and confused mind. *Id.* Because this situation is exactly what Rule 11(d) was designed to undo, *see Walden*, 625 F.3d at 965, this Court should grant the motion.

## IV. Kelsey moved to withdraw his plea as early as practicable after his father's death.

Kelsey has a valid reason for not moving to withdraw his plea sooner: he moved to withdraw the plea as early as practicable after his father's death. Kelsey's father died February 2, 2023, and his funeral was held February 6, 2023. Kelsey Decl. ¶ 6. At his request shortly thereafter, this motion was drafted and filed just weeks later.

While Kelsey is still grieving the death of his father, the day-to-day agony of not knowing whether his father will make it through the day is gone. *Id.*, ¶ 16. In addition, his boys are now sleeping through most nights. *Id.*, ¶ 12. This relative emotional respite has finally allowed Kelsey to seek this Court's mercy to be relieved of his hasty decision made with unsure heart and confused mind.

**V. Kelsey's inexperience with the criminal justice system contributed to the plea agreement.**

Two other factors this Court should consider are the degree to which the defendant has had prior experience with the criminal justice system and the defendant's nature and background. Defendant is a former attorney who has had no prior experience with the criminal justice system. *Id.* ¶¶ 19, 27. Not only did he not practice criminal law, but he lived a life with an unblemished criminal record, *see id.*, ¶ 27, and he maintained among his colleagues a reputation for the highest ethical character. The concepts of plea bargain, sentencing guidelines, and a point system that imposes a "trial penalty" are new to Defendant. *Id.* As a former attorney, the possibility of agreeing to facts which cannot, as a matter of law, constitute a criminal offense causes even more unease than it would for a non-lawyer. *Id.*, ¶¶ 19, 28.

Moreover, as a result of his lack of experience with the criminal justice system, Kelsey did not adequately consider the ancillary consequences of his plea. The ABA Report notes, a "current look at the National Inventory of Collateral consequences reveal[ing] over 40,000 possible collateral consequences that may result from criminal convictions." ABA Report at 26. Moreover, the ABA Task Force on Plea Bargaining was "particularly concerned about the frequent disconnect between the

nature of collateral consequences and the type of crime for which the defendant is convicted." *Id*.

As a result of his plea agreement, Kelsey, who had earlier decided not to seek reelection in large part because of his indictment in this case, also lost his law firm job and his law license, leaving his wife alone to provide financially for their growing family. Kelsey Decl. ¶¶ 17-20.

Under state law, a lawmaker loses his health insurance if convicted of "a felony arising out of that person's official capacity as a member of the general assembly." Tenn. Code Ann. § 8-27-208. Although the alleged federal campaign finance violation in this matter did not depend on Kelsey's membership in the general assembly, the Tennessee Department of Finance and Administration nonetheless made a preliminary determination that the Plea Agreement amounted to such a felony and terminated his family health plan on February 1. *Kelsey Decl.*, ¶ 21. Therefore, Kelsey lost health insurance for himself and his entire family as a result of his plea. Moreover, if allowed to stand, this determination also may have implications for Kelsey's state pension for his 18 years of service. *Id.*, ¶ 22.

In addition, Kelsey is being shut out from the American banking system. As a result of the Plea Agreement, CitiBank terminated the only credit card Kelsey owned in his name. *Id.*, ¶ 23. Also, Regions Bank notified Kelsey's parents that it was closing the checking account that they had held for over forty-five years because Kelsey had been given signing rights on the account last year in an effort to allow him to help his mother with her finances. *Id.*, ¶ 24. The bank confirmed that this, too, was a result of

Kelsey's Plea Agreement. *Id*. Only after weeks of wrangling did Kelsey's mother convince the bank to allow the account to remain open as long as Kelsey's name was removed from having signing privileges. *Id*., ¶ 25. But the bank had to obtain signatures from Kelsey's mother and father to accomplish this last-ditch compromise. *Id*. The local branch manager literally came into Robert Kelsey's home while he was on his death bed and forced him to muster the strength to sign some papers – all because of Kelsey's Plea Agreement. *Id*.

Losing the ability utilize the private banking system in the United States is not something Kelsey was informed would occur as a result of his plea agreement. *Id*., ¶ 26. This and the other ancillary effects are byproducts of a decision that was forced upon Kelsey in an unnecessarily hasty fashion and should be undone.

## VI. There is no potential prejudice to the government if the motion to withdraw is granted.

The final factor this Court should consider is the potential prejudice to the government if the motion to withdraw is granted. In this case, there is no prejudice to the government. No witnesses are unavailable. "The only prejudice to which [the government can point] is that arising from having to try a case it thought was concluded." *Maxwell*, 2022 U.S. Dist. LEXIS 65527, at *10. That fact, standing alone, is not significant. *See id*.

## CONCLUSION

For the reasons stated above, the Plea Agreement in this case was hastily entered with unsure heart and confused mind and should be undone. Kelsey was overwhelmed by the emotional trauma of trying to cope with his dying dad and his

newborn sons. In addition, the Plea Agreement he entered into does not amount to a crime. Together, these factors constitute a fair and just reason under Rule 11(d) to withdraw the plea. Therefore, this Court should grant this Motion to Withdraw Plea and enter an Order directing the Defendant to file his proposed Motion to Dismiss within seven calendar days.

Respectfully submitted,

s/ David A. Warrington
David A. Warrington, *pro hac vice*
Gary M. Lawkowski
Dhillon Law Group, Inc.
2121 Eisenhower Avenue, Suite 608
Alexandria, VA 22314
Telephone: 415-520-6593
DWarrington@dhillonlaw.com
GLawkowski@dhillonlaw.com

Michael A. Columbo
Dhillon Law Group, Inc.
177 Post Street, Suite 700
San Francisco, CA 94108
Telephone: 415-944-4996
MColumbo@dhillonlaw.com

*Attorneys for Defendant Brian Kelsey*

## CERTIFICATION OF COUNSEL

      Pursuant to LCrR12.01, I hereby certify that I conferred with opposing counsel in a good faith effort to resolve by agreement the subject matter of this motion via e-mail with Amanda Klopf on March 16, 2023.

<u>s/ David A. Warrington</u>
David A. Warrington

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing *Defendant Kelsey's Motion to Withdraw Plea and File Motion to Dismiss* has been electronically delivered via the Court's electronic filing system on this the 16th day of March 2023 to:

Hal Hardin
Hal D. Hardin
211 Union Street, Suite 200
Nashville, TN 37201

Amanda Klopf
Assistant United States Attorney
110 Ninth Avenue, South, Suite A961
Nashville, TN 37203-3870

John P. Taddei
U.S. Department of Justice
1301 New York Ave. NW
Washington, DC 20530

Phillip Georges
Phillip S. Georges, PLLC
501 Union St., Ste. 200d
Nashville, TN 37219

David Pritchard
Assistant United States Attorney
167 North Main Street, Suite 800
Memphis, TN 38103

Paul J. Bruno
Jerry E. Martin
David A. Rivera
Barrett, Johnston, Martin & Garrison, LLC
414 Union Street, Suite 900
Nashville, TN 37219

s/ David A. Warrington
David A. Warrington